Slip Op. 18-155

## UNITED STATES COURT OF INTERNATIONAL TRADE

DEACERO S.A.P.I. DE C.V. and DEACERO USA, INC.,

      **Plaintiffs,**

**v.**

UNITED STATES,

      **Defendant,**

**and**

NUCOR CORPORATION,

      **Defendant-Intervenor.**

**Before: Claire R. Kelly, Judge**

**Court No. 17-00183**

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the administrative review of carbon and certain alloy steel wire rod from Mexico.]

Dated: November 8, 2018

Rosa S. Jeong and Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC, argued for plaintiffs, Deacero S.A.P.I. de C.V. and Deacero USA, Inc.

Elizabeth Anne Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Tara K. Hogan, Assistant Director, Jeanne E. Davidson, Director, and Chad A. Readler, Acting Assistant Attorney General. Of Counsel on the brief was Emma Thomson Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Derick G. Holt and Daniel Brian Pickard, Wiley Rein, LLP, of Washington, DC, argued for defendant intervenor, Nucor Corporation. With them on the brief was Alan Hayden Price.

Kelly, Judge:  This action is before the court on a motion for judgment on the

agency record challenging various aspects of the U.S. Department of Commerce's

("Department" or "Commerce") final determination in the administrative review of the

antidumping duty ("ADD") order covering carbon and certain alloy steel wire rod from

Mexico.  See Pls.' Mot. J. Agency R., Dec. 15, 2017, ECF No. 24; see also Carbon and

Certain Alloy Steel Wire Rod From Mexico, 82 Fed. Reg. 23,190 (Dep't Commerce May

22, 2017) (final results of [ADD] administrative review and final determination of no

shipments; 2014–2015) ("Final Results") and accompanying Decision Mem. for [the] Final

Results of 2014/15 [ADD] Administrative Review: Carbon and Certain Alloy Steel Wire

Rod from Mexico, A-201-830, (May 15, 2017), ECF No. 21-5 ("Final Decision Memo");

Carbon and Certain Alloy Steel Wire Rod From Brazil, Indonesia, Mexico, Moldova,

Trinidad and Tobago, and Ukraine, 67 Fed. Reg. 65,945 (Dep't Commerce Oct. 29, 2002)

(notice of [ADD] orders).  Deacero S.A.P.I. de C.V., a Mexican producer and exporter of

the subject merchandise and Deacero USA, Inc., an importer of the subject merchandise,

commenced this action pursuant to section 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of

the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and

1516a(a)(2)(B)(iii) (2012).[1]  See Summons, July 17, 2017, ECF No. 1; Compl., July 17,

2017, ECF No. 2.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19
of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are to the unofficial U.S.
Code Annotated 2018 edition, which reflects the amendments made to 19 U.S.C. § 1677e by the
Trade Preferences Extension Act of 2015.  See Trade Preferences Extension Act of 2015, Pub.
L. No. 114-27, 129 Stat. 362 (2015).

Deacero S.A.P.I. de C.V. and Deacero USA, Inc., (collectively "Plaintiffs") challenge six aspects of Commerce's final determination.  See Br. Supp. Pls.' Mot. J. Agency R., Dec. 18, 2017, ECF No. 26 ("Pls.' Br.").   Plaintiffs challenge as not in accordance with law and unsupported by substantial evidence Commerce's decision (i) to use total facts available and (ii) to apply an adverse inference to those facts to calculate Deacero's final dumping margin, see id. at 16–30,[2] and related decision to disregard Deacero's revised cost dataset, see id. at 35; (iii) to select the highest rate alleged in the 2001 petition, 40.52%, as Deacero's AFA rate and final dumping margin, see id. at 30–35; (iv) not to recalculate the general and administrative expense ratio of Deacero's U.S. affiliate, see id. at 36–37; (v) not to correct certain clerical errors made in calculating Deacero's preliminary dumping margin, see id. at 37–39; and (vi) to use zeroing, instead of the average-to-average method, to calculate Deacero's dumping margin.  See id. at 39–41.[3]

For the reasons that follow, the court sustains the agency's determination to apply total facts available with an adverse inference ("AFA").   However, the court remands

---

[2] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.   However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."   See 19 U.S.C. § 1677e(a)–(b).   The phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available.

[3] On September 5, 2017, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.   These indices are located on the docket at ECF Nos. 21-2–3.  All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in these indices.

Commerce's selection of 40.52% as the AFA rate for further explanation or reconsideration consistent with this opinion.

## BACKGROUND

Commerce initiated this administrative review covering the subject merchandise entered during the period of review ("POR"), October 1, 2014 through September 30, 2015.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 80 Fed. Reg. 75,657, 75,658 (Dep't Commerce Dec. 3, 2015) ("Initiation of Reviews"). Commerce's review covered respondent Deacero S.A.P.I de C.V. ("Deacero").[4] Id.

On July 21, 2016, in response to Commerce's first supplemental questionnaire response, Deacero submitted a revised section D cost dataset.  See Deacero's Resp. Suppl. Sections A–E at Exs. Supp. D-6–7, PD 50–52, bar codes 3490088-02–04 (July 21, 2016) ("Deacero's First Suppl. Resp.").   On November 7, 2016, Commerce preliminarily calculated a 17.02% dumping margin for Deacero, relying on the revised cost dataset.  Carbon and Certain Alloy Steel Wire Rod From Mexico, 81 Fed. Reg. 80,638, 89,639 (Dep't Commerce Nov. 16, 2016) (preliminary results of [ADD] administrative review; 2014–2015) and accompanying Decision Mem. for [the] Prelim. Results of 2014/15 [ADD] Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Mexico at 12, A-201-830, PD 66, bar code 3519579-01 (Nov. 3, 2016) ("Prelim. Decision Memo"); Final Decision Memo at 22.

---

[4] The review also covered respondent ArcelorMittal Las Truchas, S.A. de C.V. ("AMLT").  See Initiation of Reviews, 80 Fed. Reg. at 75,658.  In the preliminary determination, Commerce explained that AMLT claimed that it did not make any shipments during the POR; that information was not contradicted.  See Prelim. Decision Memo at 2.  The Final Results do not indicate that Commerce changed its position from the preliminary determination.  Further, no party here challenges Commerce's determinations as to AMLT.

In the final determination, Commerce used total AFA to calculate Deacero's final dumping margin.  <u>See</u> Final Decision Memo at 4–8, 12.  Pursuant to 19 U.S.C. § 1677e(b), Commerce chose the highest margin alleged in the 2001 petition—40.52%, as Deacero's final average-dumping margin.  <u>See id.</u> at 8–9; <u>Final Results</u>, 82 Fed. Reg. at 23,190. The court heard oral argument on September 28, 2018.  <u>See</u> Oral Arg., Sept. 28, 2018, ECF No. 45.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

## I.  Commerce's Decision to Apply Total Facts Otherwise Available

Plaintiffs challenge Commerce's decision to apply total facts otherwise available to calculate Deacero's final dumping margin.  <u>See</u> Pls.' Br. at 16–25.  Defendant argues that Commerce's determination is in accordance with law and supported by substantial evidence because Deacero withheld information, submitted untimely responses to Commerce and, as a result, significantly impeded Commerce's review.  <u>See</u> Def.'s Resp. to Pls.' Mot. J. Agency R. at 13–26, Apr. 13, 2018, ECF No. 32 ("Def.'s Resp. Br.").  For the following reasons, Commerce's decision is in accordance with law and is supported by substantial evidence.

Under certain circumstances, Commerce may use facts otherwise available.  See 19 U.S.C. § 1677e(a).  Commerce shall use facts otherwise available to reach its final determination when "necessary information is not available on the record," a party "withholds information that has been requested by [Commerce]," fails to provide the information timely or in the manner requested, "significantly impedes a proceeding," or provides information Commerce is unable to verify.  19 U.S.C. § 1677e(a)(1)–(2). However, prior to resorting to facts otherwise available, Commerce must explain why the information it has is insufficient and provide, where practicable, the non-complying party with an opportunity to comply.  See 19 U.S.C. § 1677m(d).  If a party is provided with an opportunity to comply and does so, Commerce may nevertheless "disregard all or part of the original and subsequent responses" if it determines that the information provided is not satisfactory or untimely, subject to 19 U.S.C. § 1677m(e).  Id.

Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider" information that is "necessary to the determination but does not meet all the applicable requirements," if

> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and
> (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  Commerce's regulations do not specifically address whether an original submitter of information can correct its own mistakes and do not provide a time

frame within which such corrections should be submitted.  The regulations do address

submissions of untimely or unsolicited questionnaire responses, stating that Commerce

will "provide, to the extent practicable, written notice stating the reasons for rejection [of

untimely or unsolicited material]."  19 C.F.R. § 351.302(d)(1) (2015).[5]  Commerce has the

discretion to decide whether to accept corrective information on a case-by-case basis.

See Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006).   In

reaching its decision Commerce should balance "the desire for accuracy . . . with the need

for finality at the final results stage."  Id.  The corrections submitted may address errors

of a clerical, substantive, or methodological nature.  See id.

    In the final determination, Commerce applied total facts otherwise available,

explaining that Deacero impeded Commerce's review when it made changes to its cost

dataset, misrepresented the effects of those changes, and did not provide supporting

record evidence to explain the changes.  See Final Decision Memo at 4–8 (relying on 19

U.S.C. § 1677e(a)(2)(B) and (C) as the basis for its determination).   Commerce contends

that as a result of Deacero's revisions, the costs associated with production of a billet

control-number ("CONNUM") that accounts for a large portion of Deacero's sales to the

United States decreased and, for the first time, revealed that Deacero's initial submission

reported costs on a "planned production" basis, despite Commerce's directive to provide

all costs on an actual costs basis.  Id. at 6–7; see [Initial ADD] Questionnaire at D-2, PD

5, bar code 3422658-02 (Dec. 4, 2015).   In effect, Commerce contends that Deacero's

revisions resulted in "an entirely new section D dataset[.]" Final Decision Memo at 6.

_____

[5] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

Given that Deacero was always in control of its cost of production information, Commerce

determined that it impeded Commerce's review by withholding information responsive to

Commerce's requests.  Id. at 7.  Further, Commerce contends that it provided Deacero

with an opportunity to explain the revisions made, as required by 19 U.S.C. § 1677m(d),

but that Deacero's response was "not satisfactory" because it invoked an allocation

methodology not mentioned in Deacero's initial or supplemental questionnaire responses.

Id.  Commerce explains that it disregarded all of Deacero's information pursuant to 19

U.S.C. § 1677m(e) because Deacero's explanations were incomplete and unreliable.  Id.

at 7, 12.

Commerce reasonably determined that Deacero's responses impeded the review

process and that its revised section D dataset should be disregarded as unreliable.  In

providing the revised section D dataset, Deacero did not fully explain why the revisions

were necessary, what record evidence substantiated the changes it made to the billet

grades and the associated reallocation of costs, and/or what effect, if any, the changes

had on the actual costs reported by Deacero.[6]  Instead, Deacero only generally explained

---

[6] The parties dispute whether Deacero mischaracterized the extent and nature of its revisions by referring to the revisions as "minor."  See Pls.' Br. at 17–18; Def.'s Resp. Br. at 18–19. Commerce's decision to resort to total facts otherwise available, however, is not based on how Deacero characterized the revisions.  See Final Decision Memo at 12.  In the final determination, Commerce explains that although "the cost information contained in the revised section D dataset builds up to Deacero's financial statement," it decided to disregard Deacero's revised submission because Deacero did not substantiate its reallocation methodology with record evidence.  Id.  The question of how Deacero characterized its revisions, however, was relevant to Commerce's evaluation of whether Deacero acted to the best of its ability to comply with Commerce's requests for information and decision to apply adverse inferences.  See id. at 6–8 (explaining that Deacero did not act to the best of its ability to inform Commerce of the nature of the changes made and the resulting effect on the costs reported for the CONNUM accounting for the vast majority of Deacero's U.S. sales).

that it "corrected the assignment of steel scrap costs to each grade of billet produced

during the POR[,]" and attached the revised section D dataset for costs of production and

a revised factor calculation worksheet to its response.  See Deacero's First Suppl. Resp.

at 31, Exs. Supp. D-6–7.   In fact, during the hearing before the agency, counsel for

Deacero admitted that it did not proffer "a complete explanation" of the changes until the

post-preliminary questionnaire, and that its initial correction was "a more general answer

or explanation."  Hearing Tr. [Jan. 31, 2017] in the Matter of the Administrative Review of

[ADD] Order on Carbon & Certain Alloy Steel Wire Rod from Mexico at 42, PD 93, bar

code 3541550-01 (Feb. 7, 2017) ("Hearing Tr.").

After the issuance of the preliminary results, and in accordance with 19 U.S.C. §

1677m(d),[7] Commerce issued a third supplemental questionnaire in which it sought

further support for and explanation of the revisions Deacero made.  See Post-Prelim

Suppl. Questionnaire Sections B & D at 3, PD 71, bar code 3519678-01 (Nov. 7, 2016)

("Post-Prelim. Questionnaire") (requesting Deacero to explain in detail "billet cost

changes during the POR" and the changes made to CONNUMs reported during the

POR).  The explanation Deacero provided was insufficient because it did not substantiate

---

[7] Plaintiffs also argue that even if Deacero's explanation of the revised cost dataset was deficient, Commerce did not adhere to its obligations under 19 U.S.C. § 1677m(d) to notify Deacero of the problem and provide it with an opportunity to remedy or explain the identified deficiency.  See Pls.' Br. at 18; see also 19 U.S.C. § 1677m(d).   However, Commerce's post-preliminary questionnaire did identify the deficiency and provided Deacero with an opportunity to further explain the changes made.  See Post-Prelim. Questionnaire at 3.  Pursuant to 19 U.S.C. § 1677m(d), Commerce may disregard the clarifying information, in whole or in part.  In the final determination, Commerce explains that it was unable to verify the costs in Deacero's revised section D dataset because Deacero's explanation was inadequate and its changes unsupported by record evidence.  See Final Decision Memo at 7–8, 12.  Commerce's decision to disregard the information was reasonable.

the revisions made.  See generally Deacero's Resp. Post-Prelim. Suppl. Questionnaire

Secs. B & D at 2–4, Ex. 3rd Supp.-1, PD 77, bar code 3525445-01 (Nov. 25, 2016)

("Deacero's Post-Prelim. Resp.").  Specifically, Commerce explains that the documents

Deacero used to reconcile the initial and revised datasets make no reference to planned

or actual production of billets and do not indicate how Deacero's accounting system tracks

reallocation of costs based on reclassification of billets.[8]  See Final Decision Memo at 7.

Further, Deacero did not identify where it had previously explained to Commerce that if a

produced billet does not meet the grade specifications for which it was intended, costs

may be reallocated.  Deacero also did not explain how the initial section D dataset was

constructed and what record evidence supports the allocation of costs in it, or identify

what record evidence supports the cost reallocations in the revised section D dataset.

Commerce has the discretion to accept, reject, or disregard corrective information.[9]  See

---

[8] Plaintiffs argue that Commerce did not ask it to produce evidence demonstrating how costs were reallocated in its accounting system and therefore, cannot now find that Deacero failed to produce such information.  See Pls.' Br. at 19.  However, in its post-preliminary questionnaire, Commerce specifically asked Deacero to explain how billet costs changed during the POR and to produce a revised build-up of costs for a CONNUM that decreased in cost as a result of Deacero's revisions to the section D cost dataset.  See Post-Prelim. Questionnaire at 3.  In its response, Deacero only stated that the costs reported in the initial section D dataset had to be corrected because they were based on planned, and not actual, production of billets.  See Deacero's Post-Prelim. Resp. at 3–4.  Deacero did not produce or cite to any supporting record evidence that would demonstrate how the planned costs were recorded and how those costs were reallocated after billets' grades were reclassified in the revised section D dataset.

[9] Plaintiffs challenge Commerce's determination that Deacero's responses were untimely as a basis for applying total facts otherwise available.  See Pls.' Br. at 21–24.  Specifically, Plaintiffs argue that Deacero complied with all of Commerce's deadlines and submitted a corrected dataset as soon as the error was discovered.  See id.  Further, Plaintiffs contend that if any of its submissions were untimely, Commerce should have rejected the information, as its regulation requires.  See id. at 24; see also 19 C.F.R. § 351.302(d).  In fact, Plaintiffs note that Commerce relied upon the revised section D data set to calculate the preliminary weighted-average dumping margin.  Pls.' Br. at 24.

(footnote continued)

Timken, 434 F.3d at 1353; 19 U.S.C. § 1677m(d).  Given the lack of explanation and

evidence provided by Deacero, it was reasonable for Commerce to determine that

Deacero's responses were incomplete and unreliable, disregard the corrected

information, and rely on total facts otherwise available.

## II.  Application of Adverse Inferences

Plaintiffs challenge Commerce's determination to apply adverse inferences in

selection from the facts otherwise available.  See Pls.' Br. at 26–30.  Defendant argues

that Commerce's decision is in accordance with law and supported by substantial

---

Commerce's regulation addresses the rejection of untimely or unsolicited material.  See 19 C.F.R. § 351.302(d).  Here, Commerce did not reject Deacero's information, but instead disregarded the submission as unreliable.  See Final Decision Memo at 8.  Pursuant to 19 U.S.C. § 1677m(d), Commerce can disregard information submitted by a party, in response to a request from Commerce to explain or remedy an identified deficiency, if the information does not meet the requirements set out in 19 U.S.C. § 1677m(e).  The data submitted to clarify or remedy has to be reliable, 19 U.S.C. § 1677m(e)(3), and here, for the reasons provided above, Commerce reasonably determined that Deacero's was not.

In the final determination, Commerce also discusses the untimeliness of Deacero's responses.  See Final Decision Memo at 7–8.  However, it is reasonably discernable that Commerce's ultimate basis for applying total facts otherwise available was its determination that Deacero impeded the review process by withholding information necessary to verify the reliability of the revised section D dataset.  See id.  The issue, therefore, is not Deacero's timeliness, but the adequacy of Deacero's explanation and evidence for the revisions made.  Deacero made the error and it was its burden to explain the reallocation methodology and substantiate the costs associated with billet reclassification.  Instead, Deacero merely asserted that the initial section D dataset did not account for billet reclassification following quality control and, as a result, the billet costs needed to be reallocated.  See Deacero's Post-Prelim. Resp. at 2–4.  Deacero does not explain or support with record evidence how or where Deacero recorded such changes.

The parties also disagree whether, as a result of the reallocation, the total costs reported by Deacero changed.  See Pls.' Br. at 17; Resp. Br. of Def.-Intervenor Nucor Corp. [] to Deacero's Mot. J. Agency R. at 18–19, Apr. 16, 2018, ECF No. 35 ("Nucor's Resp. Br."); Oral Arg. at 01:29:04–01:29:58 (Plaintiffs' counsel arguing that the change to total costs was a "small fraction of a percent"), 01:41:35–01:41:49 (identifying record document supporting its argument regarding impact on total cost of steel scrap); 00:13:13–00:13:33, 01:40:35–01:41:17 (Defendant-Intervenor's counsel arguing that the changes made affected a "vast majority" of U.S. sales).  Whether the total actual costs changed, however, is not dispositive as to whether Commerce's determination is supported by substantial evidence.  Here, Deacero did not adequately explain the revised section D dataset or how either the initial or revised datasets were constructed.

evidence because Deacero failed to cooperate to the best of its ability to explain the revisions it made to the section D cost dataset.  See Def.'s Resp. Br. at 26–29.  For the reasons that follow, Commerce's application of adverse inferences is supported by substantial evidence.

Commerce will determine whether to apply an adverse inference after deciding that use of facts otherwise available is warranted.  See 19 U.S.C. § 1677e(b)(1)(A); 19 U.S.C. § 1677e(a).  Pursuant to 19 U.S.C. § 1677e(b), Commerce may apply an adverse inference if it "finds that an interested party has failed to cooperate by not acting to the best of its ability[.]"  19 U.S.C. § 1677e(b).  "The statute does not provide an express definition of 'the best of its ability.'"  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  However, as Nippon Steel explained, a respondent acts to "the best of its ability" when it "do[es] the maximum it is able to do."  Id.

In the final determination, Commerce explains that it applied an adverse inference because Deacero did not act to the best of its ability to explain and support with record evidence the revisions it made to its section D dataset.  See Final Decision Memo at 8.  Commerce states that Deacero was in possession of its cost information at all times and was afforded an opportunity to explain to Commerce how and why the revisions were made, but did not.  Id. at 8, 12.  Further, Commerce explains that without supporting evidence, it could not determine that Deacero's cost information was reliable.  Id.

Deacero did not act to the best of its ability to substantiate the revisions it made to its section D dataset.  A party acts to the best of its ability when it applies its maximum efforts to comply with Commerce's requests for information.  Nippon Steel, 337 F.3d at

1382.    Further, it is Deacero's responsibility to populate the record with relevant

information.  See QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

Accordingly, here, Deacero had a responsibility to provide Commerce with information

that would help Commerce understand the revisions made and would substantiate those

revisions.  In providing the revised section D dataset to Commerce, Deacero simply states

that it needed to reallocate costs to accurately reflect the "steel scrap costs [assigned] to

each grade of billet produced during the POR."  Deacero's First Suppl. Resp. at 31.

However, the resulting revised dataset was not supported by sources demonstrating how

the costs were reallocated or why it was necessary to alter the assignment of steel scrap

costs.   Subsequently, in a post-preliminary supplemental questionnaire, Commerce

provided Deacero with an opportunity to explain and substantiate the revisions made to

the dataset.  See Post-Prelim. Questionnaire at 3.  Deacero's response, although more

detailed in its explanation of why a billet may be reclassified and prompt the reallocation

of steel scrap costs to reflect the grade of billets actually produced, was not substantiated

by sources demonstrating a shift in costs.  See Deacero's Post-Prelim. Resp. at 2–4.

Further, the sources produced by Deacero to reconcile the costs reported in the initial

and revised section D datasets do not explain or substantiate the reallocation

methodology.  See id. at Ex. 3rd Supp.-1 (screenshot from Deacero's accounting system);

Final Decision Memo at 12.  Here, Deacero did not, in any of its responses, produce

record evidence supporting the costs used to create the initial and revised cost datasets.

Additionally, record evidence indicates that as early as September of 2016,

Deacero was on notice that the explanation for the revisions it made was inadequate.

Nucor Corporation's ("Nucor") September 2016 deficiency comments specifically addressed the lack of explanation and supporting evidence Deacero provided for the "significant changes" it made to the dataset. See [Nucor's] Additional Deficiency Cmmts. on Deacero's Suppl. A-E Questionnaire Resp. at 2–5, PD 55, bar code 3511019-01 (Sept. 30, 2016). In responding to Nucor's comments, Deacero merely repeated the explanation it initially provided with the revised dataset. See Deacero's Resp. Secs. B & C of Sept. 26, 2016, Suppl. Questionnaire at 5–6, PD 58, bar code 3513208-01 (Oct. 11, 2016). At the hearing before the agency, Deacero's counsel acknowledged that explanation to be general in nature. See Hearing Tr. at 42. Deacero was also not forthcoming in explaining that it reallocated costs because of errors in identifying billet grades until after the Preliminary Results were published.[10]  Deacero did not do the maximum it was able to do

---

[10] Plaintiffs challenge Commerce's finding that Deacero did not explain previously that its allocation methodology is based on planned production. See Pls.' Br. at 19–21 (explaining how and when Deacero disclosed the information to Commerce), 28–30 (explaining why Deacero's efforts demonstrate it acted to the best of its ability); see also Final Decision Memo at 7. Specifically, Plaintiffs argue that Deacero always reported its costs on an actual costs basis and that Deacero explained to Commerce that because the actual costs are based on planned billet production, actual costs may be reallocated if, for quality control reasons, a produced billet's grade has to be reclassified. See id. at 21 (citing [Deacero's] Resp. Secs. D&E Antidumping Questionnaire at D-24–25, PD 37, bar code 3441821-01 (Feb. 11, 2016)). Plaintiffs contend that Deacero simply made an error in reporting the costs in the original section D dataset and that Commerce did not request a more detailed explanation of Deacero's allocation methodology until the post-preliminary questionnaire. See id. at 19–21, 28.

     In the final determination, Commerce contends that Deacero's questionnaire responses did not explain that costs were reported on a planned production basis and that Deacero represented that it was providing actual costs. See Final Decision Memo at 4–6. Commerce, therefore, concluded that it could not understand the magnitude of the changes made to the revised section D cost dataset until Deacero explained, in its post-preliminary questionnaire response, the connection to planned production. See id. at 6. Nucor also contends that Plaintiffs misrepresent record evidence because Deacero only disclosed that wire rod costs are reallocated, not billets costs. See Nucor's Resp. Br. at 19–20. Even if Plaintiffs are correct and

(footnote continued)

to educate Commerce regarding its allocation methodology and the possibility of cost reallocation, or how the cost shifts were recorded when a billet was reclassified. Therefore, it was not unreasonable for Commerce, on this record, to determine that Deacero did not act to the best of its ability to cooperate with Commerce's requests for information.

### III. Corroboration of Total AFA Rate of 40.52%

Plaintiffs argue that the rate Commerce assigned to Deacero, as a result of resorting to total AFA, is not in accordance with law and is unsupported by substantial evidence. See Pls.' Br. at 30–35. Specifically, Plaintiffs challenge the highest rate alleged in the petition as overly punitive and uncorroborated. See id. at 33–35. Defendant argues that Commerce's determination is in accordance with law and supported by substantial evidence because the rate assigned was corroborated, has probative value, and that there is no legal precedent supporting the proposition that a high AFA rate is punitive or lacks in probative value and cannot be corroborated. See Def.'s Resp. Br. at 29–32. For the reasons that follow, Commerce's decision to rely on the petition rate is remanded for further explanation or reconsideration consistent with this opinion.

Commerce can derive an adverse inference from four statutorily identified sources of information. See 19 U.S.C. § 1677e(b)(2). Commerce's practice is to choose either the highest weighted-average dumping rate calculated for any respondent in the

---

Deacero did disclose its methodology and merely made a reporting error in its original section D dataset, Deacero failed to fully explain and reconcile the revisions made. Deacero made the error, and to ensure that Commerce was aware of and understood the revisions made, Deacero should have been more forthcoming in providing supporting evidence and explanations that would not lead to further confusion.

investigation or the highest margin alleged in the petition, whichever is higher, as the AFA

rate.  See Final Decision Memo at 8 (citing e.g., Certain Stilbenic Optical Brightening

Agents From the [PRC], 77 Fed. Reg. 17,436, 17,438 (Dep't Commerce Mar. 26, 2012)

(final determination of sales at less than fair value); Issues & Decision Mem. for the

Antidumping Investigation of Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel

Products from the [PRC]; Notice of Final Determination of Sales at Less Than Fair Value,

A-570-854, (May 31, 2000), available at http://ia.ita.doc.gov/frn/summary/prc/00-13581-

1.txt (last visited Nov. 5, 2018)).   "When [Commerce] relies on secondary information

rather than on information obtained in the course of an investigation or review,

[Commerce] shall, to the extent practicable, corroborate that information from

independent sources that are reasonably at [its] disposal."   19 U.S.C. § 1677e(c).

"Secondary information" includes information derived from "[t]he petition; [a] final

determination in a countervailing duty investigation or antidumping investigation; [a]ny

previous administrative review, new shipper review, expedited antidumping review,

section 753 review or section 762 review."   19 C.F.R. § 351.308(c)(1)(i)–(iii).   To

corroborate, means Commerce "will examine whether the secondary information to be

used has probative value."  19 C.F.R. § 351.308(d); see also Uruguay Round Agreements

Act, Statement of Administrative Action, H.R. Doc. No. 103-465, vol. 1, at 869–70 (1994),

reprinted in 1994 U.S.C.C.A.N. 4040, 4198–99.

The court must base its review of Commerce's determination upon the record of

the proceeding, which consists of

(i) a copy of all information presented to or obtained by the Secretary, the
administering authority, or the Commission during the course of the

> administrative proceeding, including all governmental memoranda
> pertaining to the case and the record of ex parte meetings required to be
> kept by section 1677f(a)(3) of this title; and
> (ii) a copy of the determination, all transcripts or records of conferences or
> hearings, and all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2)(A)(i)–(ii). Commerce's regulations require it to maintain "the

official record of each segment of the proceeding" that will form the record reviewed by

this Court. 19 C.F.R. § 351.104(a)(1). The official record will contain,

> all factual information, written argument, or other material developed by,
> presented to, or obtained by the Secretary during the course of a
> proceeding that pertains to the proceeding. . . . [and] government
> memoranda pertaining to the proceeding, memoranda of ex parte meetings,
> determinations, notices published in the Federal Register, and transcripts
> of hearings. The official record will contain material that is public, business
> proprietary, privileged, and classified.

Id.

In the final determination, Commerce chose the highest alleged rate in the petition

as Deacero's AFA rate. See Final Decision Memo at 8–9. Commerce explains that the

chosen rate was corroborated during the "pre-initiation analysis," i.e., during the initiation

of the investigation, using independent sources and was determined to be reliable and

probative then. Id. at 9 (citing Carbon and Certain Alloy Steel Wire Rod From Brazil,

Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and

Tobago, Ukraine, and Venezuela, 66 Fed. Reg. 50,164, 50,165, 50,169 (Dep't Commerce

Oct. 2, 2001) (notice of initiation of [ADD] investigations) ("Initiation of ADD

Investigations")).

Commerce has not corroborated Deacero's AFA rate. In the final determination,

Commerce presents conclusions of an analysis that was undertaken in 2001 without

placing on the record any of the relevant documents, and only cites to a Federal Register

notice announcing the conclusions reached.  <u>See</u> Final Decision Memo at 8–9 (citing

<u>Initiation of ADD Investigations</u>, 66 Fed. Reg. at 50,165, 50,169).  The standard of review

in this Court is whether Commerce's determination is supported by substantial evidence

placed on the record of the relevant proceeding.  <u>See</u> 19 U.S.C. § 1516a(b)(2)(A)(i)–(ii);

19 U.S.C. § 1516a(b)(1)(B)(i).    Here, although Commerce purports to rely upon

information it obtained during the initiation of the investigation, namely a pre-initiation

analysis memorandum and documentation supporting the calculations in the petition, that

information has not been placed on the record of this proceeding.  <u>See</u> Final Decision

Memo at 8–9 (citing <u>Initiation of ADD Investigations</u>, 66 Fed. Reg. at 50,165, 50,169); <u>see</u>

<u>also</u> Oral Arg. Tr. at 1:27:40–1:28:02 (Defendant's explaining that although "Commerce

did not put the Federal Register notice from the initiation on the record," such notices "are

publicly available documents" and that "no reason [has been given] to discount

Commerce's analysis when it determined that the original rates alleged in the petition had

probative value, which is the standard under the Statement of Administrative Action").

     The statute requires Commerce to corroborate, "to the extent practicable," the

information relied upon.  19 U.S.C. § 1677e(c)(1).  Here, Commerce did not place any

corroborating information on the record.  To the extent practicable, at a bare minimum,

requires Commerce to produce the documents it relied upon to analyze why the chosen

rate is probative.  Commerce did not corroborate the AFA rate and therefore, its decision

to rely on the petition rate is remanded for further explanation or reconsideration

consistent with this opinion.

**IV. Plaintiffs' Remaining Challenges**

Plaintiffs remaining challenges are dependent on this court finding that Commerce's determination to apply total AFA is unsupported by substantial evidence. <u>See</u> Pls.' Br. at 35–41.  Specifically, Plaintiffs challenge as not in accordance with law and unsupported by substantial evidence Commerce's (1) decision to calculate a U.S. affiliate's general and administrative expenses without accounting for further manufacturing costs incurred, (2) failure to address certain clerical errors made in the preliminary determination, and (3) use of zeroing to calculate Deacero's dumping margin. <u>See</u> <u>id.</u>  In the final determination, Commerce explains that all three challenges are moot in light of its determination to apply total AFA and assign as Deacero's weighted-average dumping margin the highest margin available in the petition.  <u>See</u> Final Decision Memo at 13–16.  The court does not reach Plaintiffs' three remaining challenges, in light of its decision to sustain Commerce's reliance on total AFA to calculate Deacero's dumping margin.

## CONCLUSION

For the foregoing reasons, the <u>Final Results</u> are sustained in part and remanded in part.  Accordingly, it is

**ORDERED** that Commerce's decision to apply total AFA to calculate Commerce's final weighted-average dumping margin is sustained; and it is further

**ORDERED** that Commerce's decision to rely on the 40.52% petition rate is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination.



  /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:  November 8, 2018
           New York, New York