Slip Op. 20-46

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DEACERO S.A.P.I. DE C.V. and DEACERO USA, INC., <br><br>    Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br> and <br><br> NUCOR CORPORATION, <br><br>    Defendant-Intervenor. | Before: Claire R. Kelly, Judge <br><br> Court No. 17-00183 <br> PUBLIC VERSION |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's second remand redetermination in the administrative review of carbon and certain alloy steel wire rod from Mexico.]

Dated: April 13, 2020

Rosa S. Jeong and Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC, for plaintiffs, Deacero S.A.P.I. de C.V. and Deacero USA, Inc.

Elizabeth Anne Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Tara K. Hogan, Assistant Director, Jeanne E. Davidson, Director, and Joseph H. Hunt, Assistant Attorney General. Of Counsel on the brief was Emma Thomson Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Alan Hayden Price, Daniel Brian Pickard, and Derick G. Holt, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor, Nucor Corporation.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ( "Commerce") second remand redetermination filed pursuant to the court's order in Deacero S.A.P.I. de C.V. v. United States, 43 CIT __, __, 393 F. Supp. 3d 1280 (2019) ("Deacero II"). See Final Results of Redetermination Pursuant to Ct. Remand [in Daecero II] Confidential Version, Oct. 29, 2019, ECF No. 71-1. ("Second Remand Results"); see also Deacero S.A.P.I. de C.V. v. United States, 42 CIT __, __, 353 F. Supp. 3d 1303, 1314–15 (2018) ("Deacero I").

Deacero II ruled that Commerce failed to comply with the court's instruction to produce the documents upon which it relied to corroborate the 40.52% petition rate it assigned to respondent as total facts available with an adverse inference ("AFA")[1] in the 2014–2015 administrative review of the antidumping duty ("ADD") order

---

[1] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." See Section 776 of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1677e(a)–(b) (2018). The phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that, as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available.

covering carbon and certain alloy steel wire rod from Mexico.[2] See Deacero II, 43 CIT at __, 393 F. Supp. 3d at 1281, 1285–87; see also Final Results of Redetermination Pursuant to Ct. Remand [in Deacero I], Mar. 15, 2019, ECF No. 58-1 ("Remand Results"); Carbon and Certain Alloy Steel Wire Rod From Mexico, 82 Fed. Reg. 23,190 (Dep't Commerce May 22, 2017) (final results of [ADD] admin. review and final determination of no shipments; 2014–2015) ("Final Results") and accompanying Decision Memo. for [the Final Results], A-201-830, (May 15, 2017), ECF No. 21-5 ("Final Decision Memo."); Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine, 67 Fed. Reg. 65,945, 65,947 (Dep't Commerce Oct. 29, 2002) (notice of [ADD] orders) ("ADD Order"). The court remanded the determination to Commerce for further explanation or reconsideration consistent with its opinion.

For its second remand redetermination, Commerce placed on the record pre-initiation documents from ADD Order; further, Commerce has placed Deacero's margin calculations, and a table summarizing Deacero's individual transaction-specific margins in the administrative review of the ADD Order that immediately

---

[2] For its initial remand redetermination, Commerce placed copies of the Federal Register notice announcing the initiation of its ADD investigation as well as the public version of the Wire Rod from Mexico Initiation Checklist on the record. See Remand Results at 6; Placement Wire Rod from Mexico Less Than Fair Value (LTFV) Notice of Initiation & Accompanying Public Version Wire Rod from Mexico Initiation Checklist on R., PRR 1, bar code 3790294-01 (Feb. 6, 2019) ("Initiation Notice" and "Initiation Checklist").

precedes the review at issue. Second Remand Results at 1–2; see also Carbon and Certain Alloy Steel Wire Rod From Mexico, 81 Fed. Reg. 41,521 (Dep't Commerce June 27, 2016) (amended final results of [ADD] admin. review; 2013–2014). Commerce explains that the factual information it has placed on the record demonstrates that the 40.52 percent petition rate has probative value for use as the AFA rate assigned to Deacero. See Second Remand Results at 2–8. For the following reasons, Commerce's Second Remand Results are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the prior two opinions, and here recounts only the facts relevant to the court's review of the Second Remand Results. See Deacero I, 42 CIT at __, 353 F. Supp. 3d at 1306; Deacero II, 43 CIT at __, 393 F. Supp. 3d at 1282–83. Commerce initiated an administrative review covering subject merchandise entered during the period of October 1, 2014, through September 30, 2015, with respondent Deacero S.A.P.I de C.V. ("Deacero" or "respondent") listed as one of the companies to be reviewed. See Initiation of Antidumping and Countervailing Duty Admin. Reviews, 80 Fed. Reg. 75,657, 75,658 (Dep't Commerce Dec. 3, 2015). Commerce, pursuant to section 776 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677e,[3] used total AFA to calculate

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant

(footnote continued)

Court No. 17-00183                                                                                                    Page 5
**PUBLIC VERSION**

Deacero's final dumping margin after determining that Deacero impeded its review process.  See Deacero II, 43 CIT at __, 393 F. Supp. 3d at 1282; see also Final Decision Memo. at 4–8, 12.  Commerce chose the highest margin alleged in the 2001 petition—40.52%—as Deacero's final weighted-average dumping margin.  See Final Decision Memo. at 8–9 & n.33; Final Results, 82 Fed. Reg. at 23,190.

The court sustained Commerce's total-AFA determination, see Deacero I, 42 CIT at __, 353 F. Supp. 3d at 1307–12, 1314, but twice remanded for further explanation or reconsideration Commerce's decision to rely on the 40.52% rate due to the lack of record information that would corroborate that rate, as required by 19 U.S.C. § 1677e(c)(1) and 19 C.F.R. § 351.308(d) (2015).[4]  See id. at __, 353 F. Supp. 3d at 1312–15; Deacero II, 43 CIT at __, 393 F. Supp. 3d at 1285–87.  In both instances, the record documents upon which Commerce relied contained conclusory pronouncements that did not demonstrate the probative value of the 40.52% petition

---

provisions of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are to the unofficial U.S. Code Annotated 2018 edition, which reflects the amendments made to 19 U.S.C. § 1677e by the Trade Preferences Extension Act of 2015 ("TPEA"). See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

Court No. 17-00183                                                                                         Page 6
**PUBLIC VERSION**

rate. See Deacero I, 42 CIT at __, 353 F. Supp. 3d at 1313–15; Deacero II, 43 CIT at __, 393 F. Supp. 3d at 1283–87.[5]

Commerce filed the Second Remand Results on October 30, 2019. On remand, Commerce placed on the record the following pre-initiation documents:

> (1) the business proprietary and public versions of Volume II of the Petition; (2) the business proprietary and public versions of three supplements to the Petition that the petitioner placed on the record of the underlying investigation prior to the Wire Rod from Mexico LTFV Initiation; (3) the business proprietary and public versions of a memorandum to the file filed prior to the Wire Rod from Mexico LTFV Initiation in which Commerce interviewed the market researcher who obtained the home market price quotes contained in the Petition; and (4) an ex parte memorandum to the file in which Commerce officials discussed questions regarding affidavits and foreign market research contained in petition supplemental questionnaires issued to the petitioner.

Second Remand Results at 2, 4–8 (footnotes omitted and italics removed); New Factual Info. Memo. ("NFI Memo."), CRRR 1, bar code 3886959-01 (Sept. 4, 2019), NFI Memo. at Attach. 1.A, CRRR 2, bar code 3886959-02 (Aug. 31, 2001) ("Petition"); NFI Memo. at Attachs. 1.B, 1.C pt.1–pt. 2, and 1.D, CRRRs 3–6, bar codes 3886959-03–06 (Sept. 4, 2019) ("Sept. 6th Supplemental Filing," "Sept. 10th Supplemental Filing," and "Sept. 17th Supplemental Filing," respectively); NFI Memo. at Attach. 1.E, CRRR 7, bar code 3886959-07 ("Telephone Memo."); NFI Memo. at Attach. 1.F,

---

[5] In Deacero I, Commerce relied on conclusions contained in a Federal Register notice, see Final Decision Memo. at 8–9 (citing ADD Order), and in Deacero II, Commerce supplemented the administrative record with, and relied on, conclusions stated in the Initiation Notice and Initiation Checklist. See Remand Results at 6–7; Initiation Notice; Initiation Checklist.

Court No. 17-00183 Page 7
**PUBLIC VERSION**

CRRR 8, bar code 3886959-08 ("Sept. 17th Ex Parte Memo.").[6] Further, Commerce placed on the record "Deacero's margin calculations from the 2013-2014 [antidumping] administrative review," Second Remand Results. at 7 (citing NFI Memo. at Attachs. 2.A.–2.L, CRRRs 9–23, bar codes 3886959-09–23 (Sept. 23, 2019); Amendment to NFI Memo. at Attachs. 2.H., 2.K.1, CRRRs 25, 26, bar codes 3891062-02–03)), "as well as a summary table that lists the individual margin transactions calculated for Deacero in the 2013-2014 administrative review." Id. at 2, 6 (citing NFI Memo. at Attach. 2L, CRRR 23, bar code 3886959-23 (Sept. 4, 2019)).

Deacero and Deacero USA, Inc. (collectively, "Plaintiffs") argue that Commerce failed to satisfy the statutory corroboration requirement because its analysis of the record documents fails to demonstrate the probative value of the 40.52% rate. See

---

[6] On September 5, 2017, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination. These indices are located on the docket at ECF Nos. 21-2–3. On April 1, 2019, Defendant filed indices to the public and confidential administrative records underlying Commerce's remand redetermination. These indices are located on the docket at ECF Nos. 61-2–3. On November 13, 2019, Defendant filed indices to the public and confidential administrative records underlying Commerce's second remand redetermination. These indices are located on the docket at ECF Nos. 73-2–3. All references to documents from the initial administrative record are identified by the numbers assigned by Commerce in the September 5th indices, see ECF No. 21, and preceded by "PD" or "CD" to denote the public or confidential documents. All references to the administrative record for the first remand determination are identified by the numbers assigned in the April 1st indices, see ECF No. 61, and preceded by "PRR" or "CRR" to denote remand public or confidential documents. All references to the administrative record for the second remand determination are identified by the numbers assigned in the November 13th indices, see ECF No. 73, and preceded by "PRRR" or "CRRR" to denote remand public or confidential documents.

Pls. [Deacero] and Deacero USA, Inc.'s Cmts. Opp'n Remand Redetermination Confidential Version, Dec. 13, 2019, ECF No. 77 ("Pls.' Br."). Plaintiffs also assert that further remand would be futile and request the court to instruct Commerce to select an "AFA rate from average weighted margins calculated for Deacero or another respondent in a prior segment." See Pls.' Br. at 1–2, 15–17. Defendant-Intervenor Nucor Corporation ("Nucor") filed comments supporting the agency's position. See Def.-Intervenor [Nucor's] Cmts. [Second Remand Results] Revised Confidential Version at 6–15, Dec. 13, 2019, ECF No. 80 ("Nucor's Br.").

## JURSIDCTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012). Commerce's antidumping determinations must be in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Deacero argues that Commerce has failed to corroborate the petition rate with independent sources. See Pls.' Br. at 1–2, 7–13. Defendant and Defendant-Intervenor counter that the pre-initiation documents, as well as documents used to

calculate transaction specific margins in the 2013-2014 review, suffice to corroborate the petition rate. See Def.'s Resp. Cmts. [Second Remand Results] at 5–6, 9–20, Jan. 31, 2020, ECF No. 82; Nucor's Br. at 6–14. For the following reasons, Commerce's determination in the Second Remand Results complies with the court's remand order, is supported by substantial evidence, and is sustained.

When Commerce relies on secondary information not obtained in the course of an investigation or review, such as allegations in a petition, Commerce must, to the extent practicable, corroborate[7] that information from independent sources reasonably at its disposal.[8] 19 U.S.C. § 1677e(c)(1); see also Uruguay Rounds

---

[7] When corroborating an AFA rate, Commerce need not demonstrate that the AFA rate is reflective of an alleged commercial reality. See 19 U.S.C. § 1677e(d)(3); see also Özdemir Boru San. ve. Tic. Ltd. Sti. v. United States, 41 CIT __, 273 F. Supp. 3d 1225, 1247–48 (2017).

[8] The court bases its review of Commerce's corroboration upon the record of the proceeding, which consists of

> (i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and
>
> (ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2)(A)(i)–(ii). Commerce's regulations require it to maintain "the official record of each segment of the proceeding[ ]" that will form the record reviewed by this Court. 19 C.F.R. § 351.104(a)(1). The official record will contain,

> all factual information, written argument, or other material developed

(footnote continued)

Court No. 17-00183                                                                                                                                Page 10
**PUBLIC VERSION**

Agreement Act, Statement of Administrative Action, H.R. Doc. No. 103-465, vol. 1, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("SAA"); 19 C.F.R. § 351.308(c)(1)(i) (listing, as a source of "[s]econdary information," information derived from "[t]he petition"). Commerce must, where practicable, corroborate secondary information because, as in the case of [information derived from] the petition, such information is "based on unverified allegations[.]" SAA at 870, 1994 U.S.C.C.A.N. at 4199. Corroboration means establishing that the rate is probative; more specifically, that is reliable and relevant to the respondent. See Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1354 (Fed. Cir. 2015).

Secondary information is corroborated with independent sources such as "published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review." SAA at 870, 1994 U.S.C.C.A.N. at 4199; see also 19 C.F.R. § 351.308(d). The statute directs Commerce to corroborate the rate to the extent practicable with independent sources reasonably at its disposal. 19 U.S.C. § 1677e(c)(1). Moreover, nothing bars Commerce

---

        by, presented to, or obtained by the Secretary during the course of a proceeding that pertains to the proceeding. . . . [and] government memoranda pertaining to the proceeding, memoranda of ex parte meetings, determinations, notices published in the Federal Register, and transcripts of hearings. The official record will contain material that is public, business proprietary, privileged, and classified.

Id.

Court No. 17-00183                                                                                                    Page 11
**PUBLIC VERSION**

from considering evidence proffered by parties with an interest in the outcome of Commerce's determination. Indeed, the SAA suggests examples such as "published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review." SAA at 870, 1994 U.S.C.C.A.N. at 4199. The statute empowers Commerce to use secondary information so long as Commerce corroborates it to the extent practicable with independent sources reasonably at its disposal. A source's independence does not stem from who submits it, but rather from who generates it. See KYD, Inc. v. United States, 607 F. 3d 760, 765 (Fed. Cir. 2010) (concluding that import statistics, price quotations, and affidavits from officials in a third-party company, attached to an antidumping petition, were independent sources) ("KYD").

Commerce has corroborated the petition rate with independent sources reasonably at its disposal to the extent practicable. See 19 U.S.C. § 1677e(c)(1); SAA at 870, 1994 U.S.C.C.A.N. at 4199. Here, Commerce selects the highest margin alleged in the petition as Deacero's AFA rate. See Final Decision Memo. at 8 (citations omitted). Commerce placed on the record pre-initiation documents upon which it relies to corroborate the petition rate used in this proceeding. See Second Remand Results at 5. Specifically, in addition to providing business proprietary and public versions of the Petition, Commerce also placed on the record three supplements to the Petition. See Sept. 6th Supplemental Filing; Sept. 10th Supplemental Filing; Sept. 17th Supplemental Filing. Commerce also submitted a memorandum reflecting

a telephone interview with the market researcher who obtained the home market price quotes contained in the Petition, see Telephone Memo., and a memorandum summarizing an ex parte meeting between Commerce officials and counsel to petitioners where the parties discussed questions regarding the affidavits and foreign market research petitioners supplied to support the petition. See Sept. 17th Ex Parte Memo. All of these documents were generated during Commerce's process of vetting the information presented at the pre-initiation stage. See Second Remand Results at 2, 4–8; see also NFI Memo.; Sept. 6th Supplemental Filing; Sept. 10th Supplemental Filing; Sept. 17th Supplemental Filing; Telephone Memo.; Sept. 17th Ex Parte Memo.

Although the provenience of the sources implicates the involvement of the petitioners, petitioners did not generate all of the information in these sources. In response to Commerce's attempts to test the veracity of the pre-initiation documents, petitioners submitted the Sept. 6th Supplemental Filing, which included a declaration of petitioner's foreign consultant who personally attested to having obtained information on prices for sales of carbon steel wire rod in Mexico by speaking to various industry sources, see Sept. 6th Supplemental Filing at Ex. 1. Although it was later confirmed that the foreign consultant's research was commissioned by the petitioners, see Telephone Memo. at 2, the consultant compiled the information by speaking to "knowledgeable industry sources." Sept. 6th Supplemental Filing at Ex.

Court No. 17-00183                                                                                                          Page 13
**PUBLIC VERSION**

1.[9]  Petitioners compiled the Sept. 10th Supplemental Filing by drafting further responses to Commerce's questions regarding the petition, and attaching an array of original and revised documents to support those responses, <u>see generally</u> Sept. 10th Supplemental Filing.[10]  Petitioners compiled the Sept. 17th Supplemental Filing by drafting responses intended to supplement deficiencies in the Sept. 10th filing, and it contains supporting documents including a revised affidavit, publicly available information and data on scrap prices, as well as other revised documents, <u>see generally</u> Sept. 17th Supplemental Filing.

The record also contains documents not generated by the petitioners.  First, Commerce generated the Telephone Memo. to memorialize a telephone conversation during which Commerce sought to "confirm the accuracy and completeness of the information provided in the declarations" of petitioners' market research consultant, Telephone Memo. at 1, <u>see also</u> <u>id.</u> at 1–3.  Second, Commerce generated the Ex Parte Memo. which memorializes a meeting between petitioners and agency officials during which both parties discussed questions regarding the supplied affidavits and foreign market research contained in supplemental questionnaires issued to the petitioner.

---

[9] The names and sources of the information in Exhibit 1 to the Sept. 6th Supplemental Filing are redacted as business proprietary information.  <u>See</u> Sept. 6th Supplemental Filing.

[10] The attachments include a document listing Import Charges from the Bureau of Census, Sept. 10th Supplemental Filing at Attach. 1, Revised Petition Exhibits, <u>id.</u> at Attach. 2, a list of ports and harbor maintenance fees, <u>id.</u> at Attach. 3, and Iron & Steel Works of the World – 13th Edition.  <u>Id.</u> at Attach. 4.

Commerce also placed on the record information obtained from third-party sources that petitioners supplied to Commerce when verifying the petition rate. See Remand Results at 15. For example, attached to the Petition is information on lending rates in Mexico derived from the International Monetary Fund's International Financial Statistics, see Petition at Ex. 1, foreign exchange rates, see id. at Ex. 2, data from the International Labor Organization regarding average wages in Mexico, see id. at Ex. 8, public information from the International Energy Agency on energy and gas costs in Mexico, see id. Exs. 9–10, as well as income statements from Altos Hornos De Mexico S.A. De C.V., see id. at Ex. 12.

Finally, Commerce placed on the record numerous confidential documents used to calculate Deacero's transaction specific margins in the 2013–2014 review. Second Remand Results at 7–8 (citing NFI Memo. at Attachs. 2.A–2.L). Commerce explains that these calculations corroborate the rate because there were instances in the 2013–2014 review where transaction specific margins came close to or exceeded the petition rate. Id.

Deacero argues that neither the pricing data on the record nor the affidavits are independent sources because they originate from sources associated with petitioners and were submitted to support petitioner's allegations—not to present unbiased facts. See Pls.' Br. at 7–9; Resp. Pls. [Deacero] & Deacero USA, Inc. to Cmts. of Def-Intervenor [Nucor] on [Second Remand Results] Confidential Version at 4, Jan. 31, 2020, ECF No. 84 ("Pls.' Reply Br."). Further, Deacero distinguishes KYD,

Court No. 17-00183                                                                                                    Page 15
**PUBLIC VERSION**

607 F.3d at 765, invoked by Commerce, stating that in <u>KYD</u> the affidavits came from third-party officials, unlike the affidavits in this instance, which were supplied by entities with ties to the petitioners. See Pls.' Reply Br. at 3–4.[11]

It is undeniable that the petitioners had a hand in generating the relevant sources here even where third party information is incorporated. Nonetheless, Commerce attempts to corroborate information to the extent practicable with information independent of the petitioners and seeks to further corroborate the rate using transaction-specific data from the prior review. Deacero does not point to any other means, reasonably at Commerce's disposal, to which Commerce could turn to further corroborate the rate. Deacero would have Commerce choose another rate, Pls.' Br. at 2, 15–17, but the statute does not dictate that Commerce must choose another rate if Commerce determines the rate is reliable and relevant to the respondent using independent sources reasonably at its disposal to the extent practicable and if that determination is reasonable based upon the record.

Under the circumstances, even to the extent that Commerce relies on non-independent sources to corroborate the rate, Commerce explains how its efforts at the petition stage demonstrate that the rate is probative and reliable; that by looking at that information in this review as well as transaction specific data from the 2013–2014 review, it has corroborated the rate to the extent practicable. Commerce tested

---

[11] The affidavits come from [[ ]] and market researchers hired by the petitioners.

the allegations raised in the petition by, for example, requiring "petitioner to provide an affidavit from the market researcher who obtained the Mexican price quote," as well as to clarify affidavits "submitted in connection with the U.S. price quote" used to calculate the petition rate.  Second Remand Results at 6–7 (citing Sept. 6th Supplemental Filing at Ex. 1; Sept. 10th Supplemental Filing at 2.)  In response, petitioners furnished affidavits from individuals who personally attest to supplying the data petitioners relied on, as well as having the requisite knowledge to provide that data.  See Sept. 6th Supplemental Filing at Ex. 1; Sept. 17th Supplemental Filing at Attach. 1.[12]  Moreover, Commerce "conducted a telephone interview with the Mexican market researcher [and] obtained information on the individual's credentials, background, experience in market research, and information collecting methods, as well as a description of the home market prices the individual obtained."  Id. at 7 (citing Telephone Memo. at 1–2).  These documents have all been placed on the record, see Second Remand Results at 1–2, and demonstrate, to the extent practicable, that the petition rate was tested by Commerce and is probative despite

---

[12] These individuals include [[                                                                           ]] a U.S. producer of carbon steel wire rod who received verbal information directly from [[

]]  as well as a market researcher, whose name and credentials are redacted, who attests to having obtained information about prices for sales of carbon steel wire rod in Mexico.  See Sept. 17th Supplemental Filing at Attach. 1; Sept. 6th Supplemental Filing at Ex. 1; see also Second Remand Results at 6–7.

the fact that they originated from parties associated with the petitioner. See Second Remand Results at 14–17.

Further Commerce uses sources reasonably at its disposal during this review to further demonstrate the reliability of the rate, namely the transaction specific margins from the 2013–2014 review. Second Remand Results at 7–8 (citing NFI Memo. at Attachs. 2.A–2.L). The fact that the petition rate falls within the range of margins calculated supports Commerce's determination that the rate has probative value. Deacero argues the rate in this sampling is aberrational, yet Deacero offers no support for this characterization. Second Remand Results at 18.[13] Deacero does not explain why Commerce's conclusions in light of this record evidence are unreasonable nor does it offer any record evidence to contradict its probative value.

---

[13] Plaintiffs argue that "the weighted-averaged margin applied to Deacero during the 2013–2014 review was merely 1.13% and the fact that the [[    ]] transactions highlighted by Commerce comprise merely [[    ]] of Deacero's U.S. sales during that review, [indicating] that the [[    ]] transactions are aberrational." Pls.' Br. at 11 (citing to Deacero's Remand Rebuttal Factual Info. Submission at Ex. 1, PRR 3, bar code 3793256-01 (Feb. 13, 2019)). Plaintiffs argue that past decisions uphold in some instances, and reject in others, the practice of corroborating AFA rates using transaction specific margins. See Pls.' Reply Br. at 4–5 (comparing Papierfabrick August Koehler S.E. v. United States, 38 CIT __, 7 F. Supp. 3d 1304, 1316 (2014), aff'd, 843 F.3d 1373 ("Papierfabrick") with Dongguan Sunrise Furniture Co. v. United States, 37 CIT __, 931 F. Supp. 2d 1346, 1356 (2013)). However, as Plaintiffs acknowledge, these cases were decided prior to passage of the TPEA, and 19 U.S.C. § 1677e no longer requires Commerce to link the selected AFA rate to the respondent's commercial reality. Id. at 5; see also 19 U.S.C. § 1677e(d)(2)(B). Further, even under the commercial reality framework, in Papierfabrick, the court upheld Commerce's decision to corroborate a petition rate based on only one transaction specific margin that was above that rate. See Papierfabrick, 38 CIT at __, 7 F. Supp. 3d. at 1317–18.

Court No. 17-00183 Page 18
**PUBLIC VERSION**

In this case, Commerce's resort to a petition rate is reasonable. Deacero contends that the pre-initiation documents Commerce placed on the record were considered for purposes of assessing the petitioners' allegations at initiation, not for corroborating the petition rate for use as an AFA rate. See Pls.' Br. at 8. However, Commerce explains that "the same independently-sourced data and the results of analysis now underpin [its] corroboration of the reliability and probative value of the petition data for use as the AFA rate." Second Remand Results at 16; see also id. at 7–8 (explaining how Deacero's transaction specific margins further demonstrate the petition rate's probative value). Simply because Commerce relies on these documents to assess allegations raised in the petition does not preclude reliance on the same documents for purposes of corroboration, provided that the agency explains how the documents demonstrate that the rate is reliable and relevant. Moreover, Commerce in this case has done all that it could do to assess the probity of the rate. Having supplemented the record with information petitioners supplied to Commerce when verifying the petition rate, Commerce announced that it would be "allowing interested parties to place rebuttal factual information on the record." NFI Memo. at 1; see also Second Remand Results at 5. The interested parties have not placed on the record any evidence challenging the probative value of the documents Commerce has placed on the record. Finally, Deacero protests Commerce's reliance on the petition rate as an alleged deviation from its ordinary practice of relying on the highest margin calculated for any respondent during the original investigation or any

subsequent review.  See Pls.' Br. at 13–15 (citing PSC VSMPO-AVISMA Corp. v. United States, 35 CIT 283, 290–91, 755 F. Supp. 2d 1330, 1338–40 (2011)).  Deacero claims, without authority, that the TPEA codified this practice by establishing a presumption of validity for AFA rates based on margins from previous reviews, and that removing the corroboration requirement for such margins demonstrates Congressional support for Commerce's practice.  Id. at 14.  Deacero's logic cannot withstand scrutiny.  Simply because Congress established a presumptive validity for AFA rates based on margins from previous reviews does not preclude the use of other corroborated rates.  Had Congress intended to limit Commerce's consideration to margins from previous reviews it could have done so.  Commerce's determination in its Second Remand Results is reasonable on this record and comports with the court's order.

## CONCLUSION

For the foregoing reasons, the Second Remand Results comply with the court's order in Deacero II, are in accordance with law and supported by substantial evidence, and are therefore sustained.  Judgment will enter accordingly.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:   April 13, 2020
         New York, New York